UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

EVARISTUS ANYANWU,

                    Plaintiff,

       -v-

THE CITY OF NEW YORK, et al.,

                  Defendants.

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 1 6 2013

10 Civ. 8498 (AJN) (THK)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

This case arises from Plaintiff Evaristus Anyanwu's employment at the New York City Administration for Children's Services ("ACS"). Plaintiff brings claims against Defendant New York City ("the City") and the former Commissioner of ACS, Defendant John Mattingly, as well as several of Plaintiff's former supervisors, Defendants Shirley Sealey, Rosalind Hay-Stevens, and Diana Cortez, for violations of federal and state antidiscrimination laws. (The Court will sometimes refer to Mattingly, Sealey, Hay-Stevens, and Cortez as the "Individual Defendants.") Plaintiff alleges that Defendants discriminated against him based on his age and national origin, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. §§ 1981 and 1983 ("sections 1981 and 1983"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. He also alleges retaliation in violation of Title VII and sections 1981 and 1983, and disability discrimination in violation of NYSHRL and NYCHRL.

1

Before the Court is Defendants' motion for summary judgment. Dkt. No. 47. Although their motion asks the Court to "dismiss[] the Complaint," Defendants have not briefed Plaintiff's retaliation and disability claims, and they concede in their Reply Brief that they have not moved for summary judgment on those claims. Def. Reply 10 n.6. Accordingly, the Court will not consider those claims in this opinion. For the reasons discussed below, Defendants' motion for summary judgment on Plaintiff's other claims is granted in part and denied in part.

## I. LEGAL STANDARD

Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d 43, 45 (2d Cir. 2000). For summary judgment purposes, a genuine issue exists if the evidence is such that a reasonable factfinder could decide in the non-moving party's favor. *Nabisco,* 220 F.3d at 45.

In a summary judgment setting, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994). However, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "More specifically, it 'must do more than simply show that there is some

2

metaphysical doubt as to the material facts' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (citations omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 975 U.S. 574, 586 (1986); and *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

## II. BACKGROUND

Unless otherwise noted, the following facts are undisputed or taken in the light most favorable to the Plaintiff.

Plaintiff is a U.S. citizen of Nigerian national origin. As of November 10, 2010 (the date of the Complaint in this action), he was 61 years old. Compl., Def. Ex. B, ¶¶ 6–7, at 2. He holds two master's degrees, including a Master's Degree in Social Work ("MSW") from Fordham University School of Social Work. Pl. Decl., Pl. Ex. 16, ¶ 4, at 1–2.

In 1999, Plaintiff was hired as a social worker at ACS, which is an agency of the City of New York. By June 2002, he had been promoted to the position of Child Welfare Specialist Supervisor 1 ("CWSS 1"), in which he was responsible for supervising a team of case workers. *Id.* ¶¶ 3, 8, at 1–2. According to applicable civil service laws and collective bargaining agreements, this title was "provisional," meaning that in the event of layoffs at ACS, he could be returned to his "underlying" title, Child Welfare Specialist 2 ("CWS 2"). Def. Ex. C.

Starting in 2005, after being reassigned following the elimination of his previous unit, he worked in ACS's Office of Case Management ("OCM") under the supervision of Cortez, Hay-Stevens, and Sealey. Pl. 56.1 ¶ 3(h), at 3. Plaintiff expressed his disappointment with the reassignment in an email memorandum to Mattingly in February 2006. Pl. Ex. 10.

In 2005, 2006, and 2007, Plaintiff applied to be a Child Evaluation Specialist in ACS's division of Family Permanency Services ("FPS"); in each case, he was not offered the job. Pl. Decl., Pl. Ex. 16, ¶¶ 10–14, at 2–3.

In the fall of 2007, Mattingly announced that ACS would be undertaking an initiative called "Improved Outcomes for Children" ("IOC"), which was essentially a reorganization of the agency. As part of the initiative, OCM would be eliminated, and ACS would seek to fill a number of new positions in other units with existing ACS employees. Pl. 56.1 ¶ 3(l), at 4; Stephens Dep., Pl. Ex. 5, at 97. The hiring took place in two phases, Phase I and Phase II. Phase I took place in 2007, and Phase II took place in 2008. Pl. 56.1 ¶¶ 3(m)–(p), 3(x)–(z), at 5, 8. All of the new positions required an MSW, as well as a Licensed Master of Social Work ("LMSW") license, but the job notices stated that selected applicants would have 18 months to receive their LMSW licenses. Plaintiff received his LMSW license in 2008. Pl. 56.1 ¶¶ 3(l)–(m), at 4–5.

Plaintiff applied for several Phase I positions and was interviewed for the jobs of Team Facilitator in FPS and Conference Facilitator in ACS's division of Family Support Services ("FSS"). He was not selected for either position. Pl. 56.1 ¶¶ 3(n)–(o), at 5.

In August 2007, Plaintiff was assigned to a new unit, "unit 902," and placed under the supervision of Melanie Duncan, who had less experience than Plaintiff. Pl. Decl., Pl. Ex. 16, ¶ 23, at 5. There, he learned that Duncan had been awarded the FSS Conference Facilitator job that Plaintiff had been denied in Phase I. *Id.* ¶ 24, at 5. Shortly thereafter, on August 27, 2007, Plaintiff suffered a heart attack, which he claims was brought on in part by the repeated denial of promotions that he had experienced since 2005. *Id.*

Plaintiff returned to work in April 2008, where he again came under the supervision of Cortez, Hay-Stevens, and Sealey. Concerned that being assigned to the same office would pose

4

a risk to his health, he requested a transfer to a different office, which was accompanied by a supporting opinion from his physician. The transfer was denied on the ground that it was not necessary based on the relevant "medical documentation." Pl. 56.1 ¶ 3(aa), at 8–9; Pl. Ex. 40.

In the spring of 2008, in connection with Phase II of the IOC initiative, Plaintiff applied for a number of positions, Pl. 56.1 ¶ 3(z), at 8, including FPS Conference Manager, FPS Borough Manager, FPS Conference Facilitator, and FSS Conference Facilitator. Pl. Ex. 41. In May 2009, Plaintiff became aware that Phase II applicants had been notified of their selection, in part because he was instructed to release one of his subordinates, who had been chosen for a position; as a result, he inquired about his application status. In June 2009, he was told that he had not been selected for any positions. Pl. 56.1 ¶ 3(bb), at 9. On June 19, 2009, Plaintiff wrote again to Mattingly about his failure to be selected for the Phase II positions; he listed his various qualifications and asked about his status with respect to his interviews. Pl. Ex. 11.

During Phase II, Lorraine Stephens, a Deputy Commissioner at ACS who was on the team charged by Mattingly with implementing the IOC initiative, called a staff meeting with OCM to discuss the initiative. At the meeting, a Nigerian employee named Ernest Enoma expressed concern that Nigerian employees were being passed over in the hiring process. Enoma followed up his complaint with an email to Stephens expressing similar concerns. Stephens Dep., Pl. Ex. 5, at 64–65, 95–101.

In March 2009, Plaintiff's immediate supervisor, Vincent Sanchez, evaluated Plaintiff as "Very Good" in his performance evaluation. However, Cortez changed the evaluation to "Good." Pl. 56.1 ¶ 3(ee), at 10.

In the spring of 2009, as a result of budget cuts at ACS, the agency was preparing for layoffs and the demotion and reassignment of provisional employees. Def. Ex. C. In a letter

dated May 11, 2009, Plaintiff was told that these cutbacks meant that employees with his title might be laid off. The letter stated that provisional employees would be laid off first but could be reassigned under their previously held permanent titles. *Id.* attach. B.

On July 2, 2009, Plaintiff was informed that his job was being eliminated, and that he would be reassigned. He was asked to prioritize among available CWSS 1 positions at ACS, and was ultimately reassigned to the Community Partnership office. Def. Ex. C. In his new role, he had no job description and no subordinates to supervise. Pl. 56.1 ¶ 3(hh), at 11.

On September 4, 2009, Plaintiff filed a complaint with the New York Division of Human Rights and the U.S. Equal Employment Opportunity Commission ("EEOC") alleging age and national origin discrimination. Def. Ex. A.

In a letter dated September 14, 2009, Plaintiff was told that his provisional title of CWSS 1 was being eliminated, and that he would be reassigned to another office under his permanent title, CWSS 2. Pl. 56.1 ¶ 3(jj), at 12; Pl. Ex. 38; Def. Ex. C. He was asked to submit a list of ACS offices at which he would be interested in working under his new title. Pl. 56.1 ¶ 3(jj), at 12; Pl. Ex. 53. On September 28, 2013, Plaintiff learned that he was assigned to ACS's Juvenile Delinquent/Persons in Need of Assistance ("JD/PINS") office effective October 5, 2009, Pl. Ex. 55, even though he had not listed it among his four preferences, Pl. Ex. 54. Plaintiff could not be placed in any of his preferred offices because he ranked 86th in seniority out of the 104 employees being reassigned. Pl. Ex. 38. As part of the reduction in force at ACS, Hay-Stevens and Sealey were also demoted. Def. 56.1 ¶ 5; Pl. Ex. 75; Pl. Ex. 76.

Upon joining JD/PINS, Plaintiff again came under the supervision of Sealey and Cortez. Pl. Ex. 2, at 42–44. Concerned that their supervision would again cause him unhealthy levels of stress, Plaintiff wrote to ACS's personnel transfer unit several times in November and December

6

2009 requesting a transfer to a different office. Pl. 56.1 ¶¶ 3(kk)–(nn), at 12–13; Pl. Ex. 12. One

such request was accompanied by a doctor's note recommending that Plaintiff be given a "less

stressful assignment or job." Pl. 56.1 ¶ 3(mm), at 13; Pl. Ex. 56. On December 21, 2009, the

transfer unit denied Plaintiff's request, concluding that he was not engaged in stressful work such

as fieldwork or travel. Pl. Ex. 12; Pl. Ex. 38. Although Plaintiff's transfer request was denied,

another employee, Deidre Weiss, was transferred out of JD/PINS. Pl. 56.1 ¶ 3(pp), at 14; Pl. Ex.

59. Weiss is younger than Plaintiff and is white. Pl. 56.1 ¶ 3(pp), at 14.

    During his time in JD/PINS, Plaintiff had a difficult working relationship with Sealey and

Cortez. For example, Plaintiff asserts that Sealey and Cortez assigned him a disproportionately

high number of monthly PINS petitions to complete. Pl. 56.1¶ 3(qq), at 14. Defendants dispute

that assertion, claiming that Plaintiff's higher monthly workload resulted instead from a backlog

caused by his failure to complete his work on time. Def. Reply 5–6; Sealey Decl. ¶ 3, at 2. In

any case, in 2010 and 2011 Plaintiff sent several emails to Sealey, Cortez, and other supervisors

expressing his dissatisfaction with how the petitions were assigned. Pl. Ex. 55; Pl. Ex. 56. In

February 2011, Sealey emailed Plaintiff about his failure to complete his petitions on time; in

response, Plaintiff complained that work was not being assigned transparently among the several

JD/PINS workers, and noted the stress that Sealey's complaints were causing him. Pl. Ex. 66.

    Plaintiff had other disputes with Sealey and Cortez while in JD/PINS. On March 26,

2010, Cortez presented Plaintiff with a memorandum detailing alleged insubordination by

Plaintiff: according to the memorandum, when Cortez assigned Plaintiff a case in person instead

of in writing, Plaintiff "shout[ed] at [her] that [he] was tired of getting verbal orders." Pl. Ex. 69.

Cortez wanted to put the memorandum in Plaintiff's personnel file, but Plaintiff refused to sign it

after consulting a union representative. Pl. 56.1 ¶ 3(uu), at 15–16; Cortez Dep., Pl. Ex. 4, at

175–78.  While Plaintiff states that Cortez did not allow him to read the memorandum before asking him to sign it, Pl. 56.1 ¶ 3(uu), at 15, Cortez disputes that contention, Cortez Dep., Pl. Ex. 4, at 178.  Plaintiff later wrote to Eric Ambrose in ACS's labor relations office to contradict the version of events in Cortez's March 26 letter.  Pl. Ex. 70.

Also in March 2010, Plaintiff registered for a training program on autism and informed Sealey and Cortez of his plans to miss work to attend it.  Pl. Ex. 68.  Sealey forbade Plaintiff from attending the training because he had not yet completed certain assignments.  *Id.*; Pl. 56.1 ¶ 3(tt), at 15.  In her deposition, Sealey conceded that autism training was ordinarily appropriate for social workers like Plaintiff, Sealey Dep., Pl. Ex. 2, at 178, while in hers Cortez stated that the training was unrelated to Plaintiff's work in JD/PINS, Cortez Dep., Pl. Ex. 4, at 183.

In March 2012, Cortez reported that Plaintiff was away without leave after Plaintiff requested and took two days off to attend depositions in this case.  Pl. 56.1 ¶ 3(xx), at 16.  After Plaintiff filed a grievance, the ACS labor relations office reinstated his pay for those days.  Pl. Ex. 72; Pl. Ex. 73.

In 2010 and 2011, several new Conference Facilitator positions became available, but Plaintiff was not interviewed for any of them.  Pl. 56.1 ¶¶ 3(ss), (vv), at 15, 16.  Neither of the individuals selected for the two positions available in 2010 appears to have been Nigerian.  Pl. 56.1 ¶ 3(ss), at 15; Lacy Dep., Pl. Ex. 9, at 204.

Plaintiff retired on January 25, 2013, after his office was moved from the eighth floor to the second floor, placing him among employees who had been selected for jobs to which he had previously applied.  Pl. 56.1 ¶ 3(yy), at 17.  He claims that this move subjected him to "ridicule and embarrassment."  *Id.*  Plaintiff did not receive any performance evaluations during his more than three years in the JD/PINS office.  Pl. 56.1 ¶ 3(vv), at 16.  Official ACS policy states that

non-managerial employees must be evaluated at least once a year, *id.*; Pl. Ex. 71, but Cortez asserts that she evaluates employees only when specifically asked to do so by the ACS personnel department, Cortez Dep., Pl. Ex. 4, at 145–46.

Plaintiff filed a complaint in this action on November 11, 2010. Dkt. No. 1.

### III. SECTION 1981 AND SECTION 1983 CLAIMS

The Court first considers Plaintiff's section 1981 and 1983 claims, which are brought only against the City and Mattingly. Compl., Def. Ex. B, at 20, 21.

"Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (some citations omitted). The same standard governs municipal liability under section 1981. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). The Supreme Court has recently reiterated that this standard encompasses "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

Plaintiff's *Monell* claim centers on the argument that ACS "created a discriminatory hiring policy that was effectuated through the IOC phases one and two." Pl. Opp. 18. What was announced as a reorganization of the agency, according to Plaintiff, was in fact designed in a way that systematically disadvantaged older and Nigerian employees at the expense of younger and non-Nigerian employees. *Id.* To illustrate that the discriminatory reorganization was consistent with a broader ACS policy, Plaintiff also claims that he was relegated to the JD/PINS unit, which was composed entirely of Nigerians over the age of 60. *Id.* at 19. Defendants argue

9

that summary judgment is appropriate because Plaintiff has not shown that any "custom or policy" was responsible for the violations he alleges. The Court agrees.

Plaintiff has not presented evidence that would permit a rational factfinder to conclude that there was a "custom, policy, or usage" at ACS of discriminating against older or Nigerian employees. Under *Monell*, any discriminatory scheme must either have been authorized by an official "whose edicts or acts may fairly be said to represent official policy," *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 137 (2d Cir. 1999) (quoting *Monell*, 436 U.S. at 694), or have been "so manifest as to imply the constructive acquiescence of senior policy-making officials," *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992).

First, Plaintiff has not shown that senior policy-making officials at ACS were directly responsible for the alleged violations. With respect to his argument about the discriminatory effects of the IOC reorganization, Plaintiff does not state who at ACS selected among applicants for the various positions, and thus who would have implemented any illegal hiring scheme. In any case, the only ACS official who would arguably qualify as an official policy-maker is Mattingly.[1] Yet nothing in the record suggests that Mattingly ever approved or took part in such a scheme. Although he authorized the IOC initiative and appointed the work group that implemented it, he did not directly take part in implementation. Stephens Dep., Pl. Ex. 5, at 64–65. Without specific evidence, Plaintiff's conclusory suggestions that Mattingly was personally involved in intentional discrimination against older and Nigerian workers cannot survive summary judgment. *See, e.g., Sulehria v. City of New York*, No. 05 Civ. 4486 (SHS) (Report &

---

[1] "A policy-maker is someone who is responsible under state law for making policy in a particular area of a municipality's business." *Jimenez v. City of New York*, 605 F. Supp. 2d 485, 530 (S.D.N.Y. 2009) (McMahon, J.) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); and *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000)). The Court assumes that Mattingly qualifies, because Defendants do not contest the issue.

Recommendation of Dolinger, M.J.), *adopted at* 670 F. Supp. 2d 288, 321 (S.D.N.Y. 2009)
(Stein, J.) (granting summary judgment where plaintiff "fails to point to any evidence of the
authorization or encouragement of . . . misconduct by a final policy maker").

Plaintiff argues that this case is "remarkably similar" to *Gaffney v. Department of
Information Technology and Telecommunications*, 536 F. Supp. 2d 445 (S.D.N.Y. 2005)
(Marrero, J.), but the differences between that case and this one are more instructive.  In *Gaffney*,
the court denied summary judgment on a claim somewhat like Plaintiff's in this case: the
plaintiffs, also employees of a New York City agency, alleged that they were victims of a
reduction in force that was implemented in a discriminatory way.  However, in *Gaffney* (among
other factual differences), the individuals responsible for discharging the employees "brought
particular actions with regard to the restructuring to the attention of [the agency's] highest
management levels."  *Id.* at 475.  Indeed, the agency commissioner himself reviewed a list of
workers scheduled to be laid off, and the only white employee on the list was removed after he
reviewed it.  *Id.*  In this case, there is no evidence of anything approaching such direct
involvement by the officials responsible for "official policy" at ACS.

Nor has Plaintiff shown Mattingly's "constructive acquiescence" in a widespread pattern
of discrimination.  *Sorlucco*, 971 F.2d at 871; *see Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d
Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is
faced with a pattern of misconduct and does nothing, compelling the conclusion that the local
government has acquiesced in or tacitly authorized its subordinates' unlawful actions.").  For
Mattingly to have acquiesced in discrimination, he must have known about it.  But there is no
evidence that he knew that the IOC program was being implemented in a discriminatory way.
While Plaintiff himself wrote to Mattingly in 2006 and 2009, Def. Ex. F; Pl. Ex. 11, his letters

11

exclusively concerned the status of job applications and contained no reference to discrimination at ACS.[2] The only proof in the record, other than in Plaintiff's deposition, of another employee's complaining about discrimination is an email sent by Ernest Enoma, an employee of Nigerian descent, to Lorraine Stephens on June 22, 2009. Pl. Ex. 13. Enoma made a similar complaint to Stephens at a staff meeting. Stephens Dep., Pl. Ex. 5, at 96–98. Stephens is not a senior policy-making official for *Monell* purposes, so her knowledge of Enoma's complaints is irrelevant, and she denies that she told Mattingly about them. *Id.* at 144.

In his deposition, however, Plaintiff claims that other Nigerians, including Enoma, wrote directly to Mattingly alleging discrimination. Pl. Dep., Pl. Ex. 1, at 206. This evidence is inadmissible on summary judgment. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). For one thing, Plaintiff's testimony is conflicted: at one point he states explicitly that three Nigerians wrote to Mattingly, but he says later that he merely "believe[s] that other Nigerians" did so. Pl. Dep., Pl. Ex. 1, at 206–07. More importantly, nothing else in the record supports Plaintiff's testimony—no testimony by the other Nigerian employees, no actual reports—and he does not state how he knew about the other reports. *See* Fed. R. Evid. 602 (requiring "personal knowledge" for admissibility of testimony). If Plaintiff's knowledge of those reports came from his discussions with other Nigerian employees, which is the only assumption the record arguably supports, the evidence would be hearsay. In any case, even if the evidence were admissible, it would be insufficient to support a claim of constructive

---

[2] In their Rule 56.1 Statement, Defendants claim that the 2006 letter was the only interaction between Mattingly and Plaintiff, Def. 56.1 ¶ 10, but Plaintiff's Exhibit 11, which is a copy of a 2009 memorandum from Plaintiff to Mattingly, suggests otherwise. As explained in the text, nothing turns on the resolution of this factual dispute.

acquiescence for *Monell* purposes because Plaintiff provides no other information about what was in the reports or how Mattingly responded to them.

Finally, there is no evidence that Mattingly was involved in or knew about Plaintiff's assignment to JD/PINS, or that he knew that the office allegedly contained only older Nigerian employees.  Thus, to the extent that those facts might evidence discrimination, they cannot support *Monell* liability.  Accordingly, summary judgment is granted on Plaintiff's section 1981 and 1983 claims against the City.

Plaintiff's section 1981 and 1983 claims against Mattingly in his individual capacity fail for essentially the same reasons.  "In order to make out a claim for individual liability under [section] 1981, 'a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.'"  *Patterson*, 375 F.3d at 229 (second and third alterations in original) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000)).  The same principle applies to section 1983 claims: "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under [section] 1983."  *Id.*

As discussed above, even if there were violations associated with the implementation of the IOC program, Plaintiff's conclusory allegations are insufficient to demonstrate that Mattingly authorized or participated in those violations.  Additionally, while a supervisor's "personal involvement" can include "deliberate indifference" or failure to act on reports of an alleged violation, *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004), there is insufficient evidence for a factfinder to find Mattingly liable on that basis.  Plaintiff argues that he referred to "wrong doing" in his 2009 letter, Pl. Opp. 21, but without any other

13

references to discrimination in that letter, a single ambiguous phrase cannot be expected to have

put Mattingly on notice of allegedly widespread discrimination at ACS. *See Augustin v.*

*Enlarged City Sch. Dist. of Newburgh*, 616 F. Supp. 2d 422, 443–44 (S.D.N.Y. 2009) (Conner,

J.) (granting summary judgment to supervisor where plaintiff's reports to him contained no

allegations of discrimination). Again, the record contains no other admissible evidence that

Mattingly actually knew about any violations. As a result, summary judgment is also granted on

Plaintiff's section 1981 and 1983 claims against Mattingly.

## IV. DISCRIMINATION CLAIMS

Plaintiff's Complaint alleges discrimination based on "age, race, color, national origin

and disability." Compl., Def. Ex. B, ¶ 1, at 1. As noted above, Defendants do not move for

summary judgment on Plaintiff's disability claims. And regardless of the language in Plaintiff's

Complaint, his briefing and the record make clear that his other claims exclusively involve

discrimination based on age and national origin, not race or color. Accordingly, the Court will

consider only the former two bases for discrimination. Because some of Plaintiff's

discrimination claims are time-barred, the Court will consider the applicable statutes of

limitations before proceeding to the merits of the remaining claims.

A. Statute of Limitations

Title VII and ADEA claims are timely only if the claimant filed a discrimination charge

with the EEOC within 300 days of the allegedly discriminatory act. 42 U.S.C. § 2000e-5(e)(1)

(Title VII); 29 U.S.C. §§ 626(d)(1)(B), 633(b) (ADEA); *Riddle v. Citigroup*, 449 F. App'x 66,

69 (2d Cir. 2011). NYSHRL and NYCHRL claims must be brought within three years of the

discriminatory act. *Strassberg v. Hilton Hotels Corp.*, 216 F.3d 1073, 1073 (2d Cir. 2000).

When a plaintiff alleges ongoing discrimination that includes acts taking place before the applicable limitations period, "the nature of the claim" determines the treatment of the prior conduct. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004). Under *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), each "termination, failure to promote, denial of transfer, or refusal to hire" is considered a "discrete act" that triggers the running of the limitations period. *Id.* at 114; *see Petrosino*, 385 F.3d at 220; *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134 (2d Cir. 2003). On the other hand, if the plaintiff alleges a continuing violation, such as a hostile work environment, the plaintiff need only show that part of the violation took place within the limitations period; once that is shown, a court may consider "the entire time period" of the violation in determining liability. *Petrosino*, 385 F.2d at 220 (quoting *Morgan*, 536 U.S. at 117) (internal quotation mark omitted). This standard applies to Plaintiff's federal and state claims. *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011) (McMahon, J.) ("The standard for applying the continuing-violation doctrine to claims under the NYCHRL and the NYSHRL is also governed by *Morgan*.").

Plaintiff's claims are predicated mainly on Defendants' not selecting him for the new positions to which he applied, and on his demotion and reassignments within ACS. Pl. 56.1 ¶ 3, at 1–17. Under *Morgan*, these are discrete acts, 536 U.S. at 114, so Plaintiff may base his claims only on events that took place during the relevant limitations periods. Plaintiff filed his EEOC complaint on September 4, 2009, Def. Ex. A, so any federal claims arising before November 8, 2008 are time-barred. Plaintiff filed this action on November 10, 2010, Compl., Def. Ex. B, at 25, so any state claims arising before November 10, 2007 are also time-barred.[3]

_____

[3] Plaintiff concedes that some of his claims are untimely, arguing that his allegations of discriminatory acts before the applicable limitations period are intended only as the "background and historical tapestry" for his timely claims. Pl. Opp. 19. The only arguable claim of a continuing violation involves his experience in the JD/PINS office, all of

Despite the difference between the federal and state limitations periods, the Court will analyze all of Plaintiff's discrimination claims together. Plaintiff was out of work on medical leave following his heart attack between August 2007 and April 25, 2008, Pl. 56.1 ¶ 3(u), at 7, and nothing occurred within that period that could reasonably be construed as discriminatory. The one episode that plaintiff mentions between November 10, 2007 and November 8, 2008—in other words, inside the limitations period for state claims, but not for federal claims—concerns ACS's denial of Plaintiff's request for a hardship transfer in August 2008. Pl. 56.1 ¶ 3(w), at 7–8. However, Plaintiff describes that episode exclusively in terms that evoke disability discrimination, so it is not relevant to the discrimination claims discussed here.

B. No Individual Liability Under Title VII and ADEA

Before proceeding to analyze the merits of Plaintiff's remaining discrimination claims against the City, the Court notes that individual employees are not subject to liability under Title VII or the ADEA. *Patterson v. Cnty. of Oneida*, 375 F.3d at 221; *Cherry v. Toussaint*, 50 F. App'x 476, 477 (2d Cir. 2002). As a result, the Individual Defendants are entitled to summary judgment on those claims.

Plaintiff argues that all of the individual Defendants had "direct involvement" in the alleged discrimination suffered by Plaintiff. Pl. Opp. 20. That kind of argument is relevant to the state-law claims against the Individual Defendants, and would be relevant if Plaintiff had brought section 1981 or 1983 claims against them, because those statutes authorize individual liability. As noted above, the section 1981 and 1983 claims contained in Plaintiff's Complaint were brought only against the City and Mattingly. Compl., Def. Ex. B, at 20, 21. As a result,

---

which occurred within the limitations period. *See* Pl. 56.1 ¶ 3(yy), at 16 (asserting that "[s]ince September 2009, . . . Defendants . . . have created an intimidating, hostile or offensive work environment").

whether Sealey, Hay-Stevens, and Cortez were personally involved in discrimination against Plaintiff is irrelevant to whether summary judgment is appropriate for the federal discrimination claims brought against them as individuals.

Unlike federal discrimination claims, claims under the NYSHRL and NYCHRL can be brought against individuals. *See Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 113 (E.D.N.Y. 2011). The Court will consider the individual liability of the Individual Defendants after determining on the merits which discrimination claims survive.

C. Legal Standard

Because Plaintiff often invokes the same episodes to support claims of both age and national origin discrimination, the Court will consider the two bases for discrimination together under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 & n.3 (2d Cir. 2007) (ADEA, NYSHRL, and NYCHRL claims analyzed together under *McDonnell Douglas*), *abrogated on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009); *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (Title VII and ADEA claims analyzed under same framework). Under that framework, a plaintiff must first establish a *prima facie* case of intentional discrimination. As discussed below, the precise elements of the required *prima facie* case can vary, depending on the circumstances and the kind of claim. *See McDonnell Douglas*, 411 U.S. at 802 n.13 (noting that "[t]he facts necessarily will vary in Title VII cases" and that the required *prima facie* showing should be tailored to "differing factual situations"). However, in all cases "there must be proof that the plaintiff 'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Aulicino v. N.Y. City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.

17

1998)).  A plaintiff's burden at this first stage has been described as "not onerous," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and "*de minimis*," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

In general, an inference of discrimination may be drawn from various circumstances, including direct evidence of "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted).  The record in this case is devoid of such overt manifestations of discrimination, so Plaintiff must rely on indirect evidence instead.[4]  *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("A victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.").

If the plaintiff makes a *prima facie* case, a presumption of discrimination arises and the burden shifts to the defendant to "come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward plaintiff." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 380 (2d Cir. 2003).  Thus, the *prima facie* case serves to "force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

---

[4] In his Rule 56.1 statement, Plaintiff denies Defendants' claim that the record contains no "overt" manifestations of discrimination.  Pl. 56.1 ¶ 3, at 1; Def. 56.1 ¶ 3, at 1.  However, in compiling support for a claim of overt discrimination, he points to evidence that would at most provide inferential proof.  Thus, the question of whether there is any actual, "smoking-gun" evidence of discrimination is not contested—there is no such evidence—and the dispute between the parties results only from Plaintiff's expansive definition of the word "overt."

A defendant that provides evidence that it was motivated by legitimate reasons "will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 455 (S.D.N.Y. 2012) (Cote, J.) (quoting *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010)) (internal quotation mark omitted).  At this final stage of the *McDonnell Douglas* analysis, the plaintiff can meet its burden by showing that the defendant's proffered reasons were pretextual or "were not the only reasons and that the prohibited factor was at least one of the motivating factors."  *Id.* (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)) (internal quotation marks omitted).

Although the burden of production thus shifts between plaintiff and defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (alteration in original) (quoting *Burdine*, 450 U.S. at 253).

D.  Alleged Episodes of Discrimination

In this case, Plaintiff's arguments that he was illegally discriminated against fall into three groups: (1) that he was not selected for the jobs to which he applied and that ACS's decisions not to select him were discriminatory; (2) that his reassignments, first to the Community Partnership office and then to the JD/PINS office, were discriminatory; and (3) that his supervisors in the JD/PINS office discriminated against him in various ways.  The Court will address these three groups of arguments separately.

1.    *Failure to Promote*

To make a *prima facie* case with respect to a failure-to-promote claim, Plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position for which

the employer was seeking applications; (3) he was rejected for the position; and (4) this adverse action took place under circumstances giving rise to an inference of discrimination.[5] *See Mandell*, 316 F.3d at 377.  Defendants do not contest the first three elements of this test, but they deny that Plaintiff has established circumstances giving rise to an inference of discrimination.

Plaintiff's first timely failure-to-promote claim involves Defendants' failure to select him for any of the positions for which he interviewed in connection with Phase II of the IOC program between September and December of 2008.  Pl. 56.1 ¶ 3(z), at 8.  Plaintiff discovered that he was not selected for any of the positions in May 2009, *id.* ¶ 3(bb), at 9, so Defendants' failure to promote him in Phase II falls within the 300-day limitations period for his federal discrimination claims.  *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996) ("The timeliness of a discrimination claim is to be measured from the date the claimant had notice of the allegedly discriminatory action."), *abrogated on other grounds by Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

To create an inference of discrimination, Plaintiff first claims that "[a] high number of the people selected over Plaintiff . . . were younger and less qualified than Plaintiff."  Pl. Opp. 4. The record reveals successful applicants' ages only for four of the eight Phase II positions to which Plaintiff applied: FPS Conference Manager, FPS Borough Manager, FPS Conference Facilitator, and FSS Conference Facilitator.  *See* Pl. Ex. 41 (listing positions to which Plaintiff

---

[5] The fourth element of the *prima facie* case is sometimes said to be whether "the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."  *E.g.*, *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998).  That formulation is inapposite in cases like this one, however: an employer who fills multiple available positions in a discriminatory way (for example, by selecting only white applicants) may not escape liability simply because the positions do not "remain[] open."

applied); Pl. Ex. 74 (listing employees hired during Phase II along with their age).[6]  A 66-year-old applicant received one of the seven Borough Manager positions; three applicants between 58 and 65 received FSS Conference Facilitator positions; and several applicants between 55 and 60 received FPS Conference Facilitator positions.  Pl. Ex. 74.  Plaintiff thus fails at the outset to generate an inference that Defendants discriminated against employees of his age with respect to those positions.[7]  *See Powell v. Consol. Edison Co. of New York, Inc.*, No. 97 Civ. 2439 (GEL), 2001 WL 262583, at *11 (S.D.N.Y. Mar. 13, 2001) (promotion of another member of plaintiff's class negated inference of discrimination); *cf. Silva v. Peninsula Hotel*, No. 05 Civ. 08621 (RJH) (TJK) (Report & Recommendation of Katz, M.J.), *adopted at* 509 F. Supp. 2d 364, 382–83 (S.D.N.Y. 2007) (Holwell, J.) (that benefit was awarded to member of plaintiff's class negated inference of discrimination); *Magnan v. Manhattan Eye, Ear & Throat Hosp.*, No. 01 Civ. 6306 (HB), 2002 WL 334505, at *4 (S.D.N.Y. Feb. 22, 2002) (same).   However, of the two applicants selected for FPS Conference Manager, the oldest was 49 years of age.  It is undisputed that Plaintiff was qualified for this position.  Pl. 56.1 ¶ 3(d), at 2.

---

[6] Although Plaintiff's Exhibit 74 does not state whether these applicants were selected for positions in FPS or FSS, it does list the job vacancy numbers ("JVNs") of the jobs for which the applicants were selected.  By matching those numbers against the JVNs on the list of positions to which Plaintiff applied, Pl. Ex. 41, one can determine which division the positions on Exhibit 74 were in.

[7] While the Second Circuit has stated that "an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably," *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000), that is relevant only later in the *McDonnell Douglas* analysis, after an inference of discrimination against the individual employee has already been established. *See id.* at 43–44; *see also Connecticut v. Teal*, 457 U.S. 440, 454 (1982), *cited in Graham*, 230 F.3d at 43 ("[R]esolution of the factual question of [discriminatory] intent is not what is at issue in this case.  Rather, petitioners seek simply to justify discrimination against respondents on the basis of their favorable treatment of other members of respondents' racial group."); *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 151 n.5 (2d Cir. 2000), *cited in Graham*, 230 F.3d at 44 ("[A]n employer who discriminates against an individual because of his or her membership in a protected class acts wrongfully even if it treats favorably other persons within the protected class.").

Plaintiff also claims that only two candidates selected during Phase II, Robert Osei and Ugo Onwuka, were Nigerian. Pl. 56.1 ¶ 3(cc), at 10. Defendants contend that "Plaintiff cannot provide competent evidence of the number of Nigerians who applied and received or were denied promotions," in part because "ACS does not maintain records of national origin" and thus could not produce such records in discovery. Def. Reply 4. Plaintiff responds that as a Nigerian at ACS, he was naturally familiar with whether other ACS employees were Nigerian. For purposes of summary judgment, the Court concludes that Plaintiff's testimony has at least created a triable issue of fact regarding whether these two employees were Nigerian. Both Osei and Onwuka were selected for FPS Conference Facilitator, Pl. Ex. 74, so Plaintiff cannot succeed in raising an inference of discrimination against Nigerians with respect to that position. However, if Plaintiff is correct that no successful Phase II applicants were Nigerian *other* than Osei and Onwuka, then none of the applicants selected for FPS Conference Manager, FPS Borough Manager, or FSS Conference Facilitator were Nigerian. It is undisputed that Plaintiff was qualified for all three positions. Pl. 56.1 ¶ 3(d), at 2.

The next alleged failure to promote involves Defendants' failure to interview or select Plaintiff for two FPS Conference Facilitator positions while he was working in the JD/PINS unit in 2010. Pl. Decl. ¶ 36, at 8; Pl. 56.1 ¶ 3(ss), at 15. Although Defendants fail to raise this point, there is no evidence in the record that Plaintiff even applied for these positions. *See Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (a plaintiff must show that he applied for the position at issue). Rather, Plaintiff vaguely asserts that he was "denied promotions" and implies that he expected to be interviewed because he had previously been told that his "resume would be kept on file for future reference." Pl. Decl. ¶ 36, at 8. However, the Court assumes for the sake of argument that he applied and was qualified for FPS Conference Facilitator in 2010.

There is no evidence in the record about the successful candidates' ages, but the Court will again assume that Plaintiff has sufficiently shown that the selected candidates were not Nigerian, particularly because he bases his claim not only on his own knowledge but also on deposition testimony by Tula Lacey, a staff member in ACS's personnel office.  Pl. 56.1 ¶ 3(ss), at 15; Lacey Dep., Pl. Ex. 9, at 204.

Finally, Defendants did not interview Plaintiff for an additional Conference Facilitator position for which he applied in 2011.  Pl. 56.1 ¶ 3(ww), at 16; Pl. Ex. 87.  However, the record does not reveal any information about the individuals selected for those positions.

To briefly summarize: With respect to his applications during Phase II of the IOC program, Plaintiff has shown—at least for purposes of summary judgment—that he was denied the job of FPS Borough Manager in favor of younger applicants, and that he was denied the jobs of FPS Conference Manager, FPS Borough Manager, and FSS Conference Facilitator in favor of non-Nigerian applicants.  And with respect to the Conference Facilitator positions that became available in 2010, he has shown that he was denied the jobs in favor of non-Nigerian applicants.

Showing more favorable treatment of employees not in the plaintiff's protected group is an established method of raising an inference of discrimination in order to satisfy the fourth element of a *prima facie* case.  *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). As far as age discrimination is concerned, more favorable treatment of an employee *within* the protected group may raise the same inference if the favored employee is significantly younger than the plaintiff.[8]  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). Standing alone, however, differential treatment does not necessarily suffice, and whether it

---

[8] For this reason, Defendants' argument that Plaintiff's claim is "undermine[d]" by the selection of employees over 40, who are also protected by the ADEA, is incorrect.  Def. Reply 2.

supports an inference of discrimination depends significantly on context. Plaintiff has provided only limited evidence of how his qualifications compare to those of the successful applicants. Before assessing that evidence, the Court must consider whether Plaintiff is required to submit *any* evidence of relative qualifications in order for a reasonable factfinder to draw an inference of discrimination.

In so-called "disparate treatment" cases, or those in which a plaintiff attempts to generate an inference of discrimination by asserting that he was treated differently than other employees based on a prohibited factor, the Second Circuit requires a showing that the more favorably treated employees were "similarly situated" to the plaintiff "in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); *see also Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494–95 (2d Cir. 2010); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53–55 (2d Cir. 2001). In those cases, significant distinctions between the plaintiff's situation and the other employees' suggest "that the defendant's treatment of those employees had no logical relevance to the plaintiff's claims." *McGuinness*, 263 F.3d at 54.

By contrast, in cases in which a plaintiff was *discharged* for allegedly discriminatory reasons, "[t]he fourth element of the prima facie case may be satisfied by a showing that the plaintiff's position remained open after he was discharged, or that he was replaced by someone outside his protected class," without a showing that the plaintiff and his replacement were similarly situated. *Tarshis v. Riese Org.*, 211 F.3d 30, 36 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis.").

24

This case fits neatly in neither category.  Plaintiff's claim is that he failed to be selected for sought-after jobs within ACS, the organization in which he already worked.  In failure-to-promote cases, the Second Circuit appears to require at least some comparison of the plaintiff's qualifications with those of the promoted employee(s) at the *prima facie* stage.  In *Mandell v. County of Suffolk*, 316 F.3d 368, for example, the court applied the standard used in disparate treatment cases.  It held that a Jewish police officer passed over for promotions in favor of Catholic colleagues had made a *prima facie* case on summary judgment only after identifying enough "evidence to support a finding" that he and the promoted officers were "similarly situated in all material respects."  *Id.* at 379 (quoting *Graham*, 230 F.3d at 39).  The court in *Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003), employed a similar, though less demanding, approach: it found an inference of discrimination when a white employee was denied a transfer and the position was offered to "an allegedly significantly less qualified African-American man."[9]  *Id.* at 139.  Consistent with these cases, at least some courts in this district, including the undersigned, have explicitly required evidence of relative qualifications at the *prima facie* stage in failure-to-promote cases.  *See, e.g., Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 334–35 (S.D.N.Y. 2005) (Marrero, J.); *Monte v. Ernst & Young LLP*, 330 F. Supp. 2d 350, 362 (S.D.N.Y. 2004) (Swain, J.), *aff'd*, 148 F. App'x 43 (2d Cir. 2005); *Morris v. N.Y. City Dep't of Soc. Servs.*, No. 11 Civ. 4818 (AJN), Dkt. No. 40, at 7–8 (S.D.N.Y. July 25, 2013); *Kaboggozamusoke v. Rye Town Hilton Hotel*, No. 05 Civ. 4029 (KMW) (RLE), 2008 WL 4410106, at *7 (S.D.N.Y. Sept. 26, 2008).

---

[9] In analyzing the plaintiff's claims with respect to a second transfer that went to another applicant, the *Terry* court did not look at relative qualifications, but it did not rely solely on the applicants' age differential either: it pointed to derogatory comments and evidence that age entered into the employer's decisionmaking. 336 F.3d at 139–40.

Indeed, comparing qualifications at the *prima facie* stage makes intuitive sense, because selecting another employee for promotion instead of the plaintiff involves choosing among multiple candidates. The mere fact that the plaintiff was qualified for the job—which is established as the second element of the *prima facie* case—says nothing about which candidate was *more* qualified. As a logical matter, only if a "reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, [can] the factfinder . . . legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *United States v. City of New York*, 713 F. Supp. 2d 300, 319 (S.D.N.Y. 2010) (Pauley, J.) (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007)) (internal quotation marks omitted). For that reason, an inference of discrimination cannot emerge until after a plaintiff's qualifications are compared against the promoted employee's. The situation is quite different in discharge cases, because simply showing that the plaintiff's "performance was of sufficient quality to merit continued employment . . . rais[es] an inference that some other factor was involved in the decision to discharge him." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978) (quoting *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir. 1977)).

Therefore, the rationale behind examining qualifications at the *prima facie* stage in failure-to-promote cases would seem to apply as well to failure-to-hire claims (*i.e.*, those in which the applicants do not already work for the employer), which also involve an employer's choice among multiple applicants. However, the Second Circuit has seemingly taken a different approach. In *Byrnie v. Town of Cromwell Board of Education*, 243 F.3d 93 (2d Cir. 2001), the court held that the plaintiff had made a *prima facie* case simply by showing that he was

"eminently qualified" for the art teaching position that the employer awarded to a "substantially younger" applicant. *Id.* at 103. It took the same approach in another age discrimination case, *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193 (2d Cir. 2007). *See id.* at 195 (holding that plaintiff had met the fourth element of a *prima facie* case where "one of the individuals who was offered a position was eight years younger"). In both cases, the court considered the relative qualifications of the applicants only later in the *McDonnell Douglas* test, when the employers cited qualifications as a legitimate business reason for preferring the younger candidate. *See D'Cunha*, 479 F.3d at 195; *Byrnie*, 243 F.3d at 102–03. Somewhat vexingly, courts in this district have sometimes extended the same approach to failure-to-promote cases, without addressing the contrary position implied by *Mandell* and *Terry*. *See, e.g., Bielinski v. Hotel Pierre*, 591 F. Supp. 2d 541, 551 (S.D.N.Y. 2008) (Scheindlin, J.); *Evans v. Port Auth. of N.Y. & N.J.*, 192 F. Supp. 2d 247, 267 (S.D.N.Y. 2002) (Kaplan, J.); *Mitchell v. N. Westchester Hosp.*, 171 F. Supp. 2d 274, 278 (S.D.N.Y. 2001) (McMahon, J.).

This Court concludes that both the law and logic require a different approach from that of the district courts cited above. Here, Plaintiff must provide at least some evidence that his qualifications were comparable to those of the selected employees at the *prima facie* stage. For one thing, because Plaintiff was already employed at ACS, this is a failure-to-promote case; any failure-to-hire cases can be distinguished on that (admittedly unsatisfactory) basis. Additionally, requiring evidence of relative qualifications at the *prima facie* stage is consistent with the weight of authority from those circuits that have addressed the question.[10] Finally, if one puts the

---

[10] *See, e.g., Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004) (requiring showing that plaintiff was rejected "in favor of someone possessing similar qualifications"); *Smith v. Univ. of N. Carolina*, 632 F.2d 316, 341 (4th Cir. 1980) (approvingly quoting district court's statement that "[t]he essence of the fourth element in *McDonnell Douglas* is the requirement that the Title VII plaintiff have similar qualifications to those persons who the employer is seeking to recruit for the desired position"); *Hebert v. Monsanto Co.*, 682 F.2d 1111, 1127 n.19 (5th Cir. 1982);

various articulations of the *McDonnell Douglas* standard aside, the fundamental question at the

*prima facie* stage is always whether the plaintiff has come forward with enough proof to justify a

presumption that his employer illegally discriminated against him. *See, e.g., Aulicino*, 580 F.3d

at 80. In cases like this, in which the record is entirely devoid of overt manifestations of

discrimination, inferences from the employer's otherwise benign conduct must carry the

plaintiff's entire burden. A reasonable factfinder could not logically infer discrimination from

Defendant's mere selection of other applicants over Plaintiff without knowing anything about

those applicants other than that they fell outside Plaintiff's protected class.

At the same time, in determining how *much* evidence Plaintiff must present about his

qualifications relative to the successful applicants', the Court is conscious of the Second

Circuit's repeated admonition that a defendant's burden at the *prima facie* stage is "*de minimis*,"

*Abdu-Brisson*, 239 F.3d at 467, in part because direct evidence of discrimination can be hard to

come by. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d at 1224 ("Because writings

directly supporting a claim of intentional discrimination are rarely, if ever, found among an

employer's corporate papers, affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination."). The Court must

determine only "whether the proffered admissible evidence shows circumstances that would be

---

*Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000) (requiring showing that "other employees of
similar qualifications who were not members of the protected class received promotions at the time the plaintiff's
request for promotion was denied"); *Baron v. City of Highland Park*, 195 F.3d 333, 340 (7th Cir. 1999) (asking
whether promoted employees had "similar or lesser qualifications" compared to plaintiff; *Carlile v. S. Routt Sch.
Dist.*, 739 F.2d 1496, 1500 (10th Cir. 1984); *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981) (requiring
showing that "other employees of similar qualifications who were not members of the protected group were indeed
promoted at the time the plaintiff's request for promotion was denied"). *But see Torgerson v. City of Rochester*, 643
F.3d 1031, 1047 (8th Cir. 2011) ("This circuit . . . has squarely rejected the proposition that a plaintiff must prove
her relative qualifications to meet her *prima facie* burden"); *Walker v. Mortham*, 158 F.3d 1177, 1185–93 (11th Cir.
1998) (rejecting requirement that plaintiff prove relative qualifications at *prima facie* stage).

sufficient to permit a rational finder of fact to infer a discriminatory motive.  It is not the province of the summary judgment court itself to decide what inferences should be drawn." *Chambers*, 43 F.3d at 38.

Although Plaintiff makes a number of other conclusory assertions, his argument that some selected employees were "less qualified" than him essentially rests on four pieces of evidence.  None relates to the Borough Manager or Conference Manager positions that Plaintiff applied to in Phase II, or to the Conference Facilitator positions that Plaintiff applied to in 2010 and 2011.  Accordingly, summary judgment is granted with respect to those positions.

As an initial matter, the Court rejects Plaintiff's attempt to use statistics to prove that older and Nigerian employees were disproportionately passed over for promotions during the IOC program, because his "statistics" amount to nothing more than conclusory assertions. Plaintiff claims that, based on his familiarity with the ranks of Nigerian employees in ACS, over 40 Nigerians applied for Phase I positions, while only five were selected.  Pl. Decl., Pl. Ex. 16, ¶ 21, at 4–5.  As explained above, the Court is willing—at least for purposes of summary judgment—to accept Plaintiff's claims that certain *specific* ACS employees were Nigerian.  But with respect to the total number who applied and were selected, Plaintiff has not identified any employees specifically.  Therefore, it is impossible to know from the record which applicants were Nigerian, which positions they applied to, or whether they were selected.  While Plaintiff has presented a list of employees' ages, there is again no indication of what positions they applied to or were selected for.  Pl. Ex. 34.  Nor has Plaintiff provided any evidence that rejected employees were qualified for the positions they applied to, or how their qualifications compared to the selected candidates'.  Accordingly, leaving aside the question of whether Phase I ought to be considered at all (because it falls outside the limitations period), Plaintiff's statistical claims

cannot be used to generate an inference of discrimination based on age or national origin. Plaintiff's claim that only two of 45 Nigerians were selected during Phase II also fails to generate such an inference because he does not say which other employees on the list of applicants were Nigerian or whether they were qualified. Pl. 56.1 ¶ 3(cc), at 10.

The first piece of actual evidence that Plaintiff points to is a list of interview scores, unaccompanied by any supporting documentation, which shows that Plaintiff received a score of 33. Pl. Ex. 48. Plaintiff notes that two other candidates with scores of 33 were offered jobs, while he was not, and that Melanie Duncan, a younger staff member, was chosen for Conference Facilitator despite scoring a 30. Pl. 56.1 ¶ 3(cc), at 9. These scores do not help Plaintiff. There is no date on the exhibit listing the scores, and Plaintiff does not provide one. Maduegbuna Decl. ¶ 51, at 3. However, he states elsewhere that Duncan was promoted in 2007, as part of Phase I of the IOC program, which falls outside the applicable limitations period. Pl. Ex. 16, ¶¶ 23–24, at 5. That fact suggests that the two other candidates who scored a 33 were promoted during Phase I as well, and any claim premised on their promotion at that time is also time-barred. Somewhat confusingly, one of those candidates, Maxine Williams, appears on the list of applicants offered positions during Phase II. Pl. Ex. 74. But even if the interview scores were associated with Phase II (for example, if Duncan appears on the list because she applied for another job during Phase II and was interviewed for it then),[11] Williams was awarded an FPS Conference Facilitator job, which, as discussed above and as Plaintiff concedes, multiple other members of Plaintiff's nationality and age also received.

---

[11] Although Defendants are correct that it is extremely difficult to glean useful information from Plaintiff's exhibits, there is other evidence suggesting that the interview list was associated with Phase I. For instance, it seems to indicate that another interviewee, Patricia Bassy, accepted a Conference Facilitator position, Pl. Ex. 48, but the list of applicants selected during Phase II states that Bassy was selected for Borough Manager, Pl. Ex. 49.

Second, Plaintiff points out that one of his subordinates, Susana Santos, was selected for a position during Phase II. Pl. 56.1 ¶ 3(bb), at 9; Pl. Ex. 46. While Plaintiff does not say so explicitly, the record shows that Santos was selected for FPS Conference Facilitator. Pl. Ex. 74. As noted above, other members of Plaintiff's protected classes were also selected for that position, so the fact that Santos was Plaintiff's subordinate cannot give rise to an inference of discrimination based on age or national origin.

Third, Plaintiff points to a list of candidates selected for positions in FPS who were reassigned for failure to obtain their LMSW license, which Plaintiff held. Pl. 56.1 ¶ 3(cc), at 10; Maduegbuno Decl. ¶ 52, at 6; Pl. Ex. 50. Plaintiff himself does not state which position these employees were promoted to and when, but they appear on the list of applicants selected for FPS Conference Facilitator during Phase II. Pl. Ex. 74. Again, because people of Plaintiff's national origin and age were selected for that job, the apparent discrepancy in qualifications does not give rise to an inference of discrimination.

Finally, Plaintiff relies on deposition testimony by Lacey stating that four employees were hired under the IOC program despite the fact that they did not hold their LMSW license. Pl. 56.1 ¶ 3(cc), at 10; Lacey Dep., Pl. Ex. 9, at 213–15. It is arguable whether these four were actually "promoted" in Plaintiff's place, because they were discharged from their new positions after not obtaining their licenses within a certain period of time. Lacey Dep., Pl. Ex. 9, at 215. (The job notices themselves were transparent about this grace period. Pl. Ex. 43, 44, 45.) However, the Court will focus on their initial selection, because if Plaintiff had been selected instead, he presumably would not have been discharged for failure to obtain a license that he already held. The four employees whom Lacey states were reassigned—Carol Campbell, Angelina Semino, Magdala Nelson, and Wana Ulysse, Lacey Dep., Pl. Ex. 9, at 213–14—were

awarded FSS Conference Facilitator jobs in Phase II. Pl. Ex. 74.[12]  As discussed above, Plaintiff

has sufficiently shown that no one selected for that position was Nigerian. There is thus

evidence that in choosing FSS Conference Facilitator applicants, ACS chose exclusively non-

Nigerians, several of whom were less qualified than Plaintiff in one important respect. *See*

Stephens Dep., Pl. Ex. 5, at 91 (calling the LMSW license a "core qualification[]" for IOC jobs).

The Court concludes that from these facts, a reasonable factfinder could draw an inference of

discrimination with respect to national origin.

Of course, legitimate business reasons could easily account for ACS's choice to promote

other candidates over Plaintiff. Under *McDonnell Douglas*, however, the burden of presenting

evidence of those reasons falls to Defendants. While this is not a particularly heavy burden, *see*

*Reeves*, 530 U.S. at 142 (explaining that "[t]his burden is one of production, not persuasion" and

thus "can involve no credibility assessment" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 509 (1993)) (internal quotation marks omitted)), Defendants point to no evidence at all that

might explain their choice of the other candidates over Plaintiff. While Defendants' brief

implies that Plaintiff was underqualified relative to the selected applicants, Def. Br. 7–8, such

vague assertions, without support in the record, cannot carry Defendants' burden. *See Burdine*,

450 U.S. at 255 ("[T]he defendant must clearly set forth, through the introduction of admissible

evidence, the reasons for the plaintiff's rejection."); *Bucalo v. Shelter Island Union Free Sch.*

*Dist.*, 691 F.3d 119, 132 (2d Cir. 2012) ("[T]he defendant must articulate its legitimate,

nondiscriminatory reason with some specificity.").

---

[12] The spelling of these names differs slightly between Lacey's deposition and the list of successful applicants. The Court adopts the spelling from the latter. Pl. Ex. 74. There is also an issue of fact (which neither party addresses) regarding whether Carol Campbell on Exhibit 74 is the "Miss Campbell" referred to in Lacey's deposition. Lacey Dep., Pl. Ex. 9, at 213. On summary judgment, the Court will assume that she is.

Instead of offering a nondiscriminatory reason for not promoting Plaintiff, Defendants cite *Byrnie* for the proposition that for an inference of discrimination to emerge, "[t]he plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person . . . could have chosen the candidate selected over the plaintiff for the job in question." Def. Reply 3 (first alteration in original) (quoting *Byrnie*, 243 F.3d at 103) (internal quotation marks omitted). That is not what *Byrnie* says. The quoted language was addressing the final stage of the *McDonnell Douglas* test, after the plaintiff has established a *prima facie* case and the defendant has provided a legitimate business reason for not hiring him. *See Byrnie*, 243 F.3d at 102–03. A plaintiff's burden at the *prima facie* stage is lower: he need only generate an inference of discrimination, not prove that the defendant actually discriminated against him. In this case, Plaintiff has generated such an inference, and Defendants have not carried their corresponding burden. Accordingly, summary judgment is denied with respect to Plaintiff's failure-to-promote claim insofar as it relates to the FSS Conference Facilitator position that he applied to during Phase II.

> 2.   *Reassignment/Demotion*

Plaintiff's next set of discrimination claims involves the two reassignments that he endured in 2009. To make a *prima facie* case of discrimination with respect to these claims, Plaintiff must show that (1) he belonged to a protected class, (2) he was qualified for the position he held, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See, e.g.*, *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (Sotomayor, J.). Again, Defendants contest only the fourth element of this test.

First, in June and July of 2009, Plaintiff was reassigned to the Community Partnership office at his provisional title of CWSS 1.  Plaintiff claims that this reassignment was a "sham designed to make it seem as if Plaintiff had been promoted," but which actually "humiliated Plaintiff."  Pl. 56.1 ¶ 3(hh), at 11.  He claims that in his new role, he had no job description and no subordinates to supervise.  *Id.*  It is arguable whether this reassignment constituted an adverse employment action, *see Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) ("a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career"), but Defendants do not contest the point.  In any case, Plaintiff never says how the circumstances around this first reassignment give rise to an inference of discrimination.

Next, in September and October of 2009, Plaintiff's provisional title was eliminated, and he was reassigned to the JD/PINS office at his permanent title of CWS 2.  This change in title surely qualifies as an adverse employment action.  *See Galabya*, 202 F.3d at 640 (listing "a demotion evidenced by a decrease in wage or salary," and "a less distinguished title" among examples of adverse employment actions (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993))).  Again, however, Plaintiff does not cite any evidence that would allow a factfinder to draw an inference of discrimination.  He claims that the JD/PINS unit eventually became "a place where undesirable employees, such as older workers or [those] of Nigerian national origin, are assigned."  Pl. 56.1 ¶ 3(oo), at 14.  But he also states that when he was first assigned to the unit, it contained "six ACS employees of different ages, races and national origins."  *Id.*  Therefore, even if one credits his characterization of JD/PINS as it existed later, one cannot infer discrimination from his initial assignment to the office.

Thus, Plaintiff has not made a *prima facie* case of discrimination with respect to the two reassignments. Moreover, even if he had, Defendants have presented evidence of a legitimate, nondiscriminatory reason for their actions.[13] They assert that budget cuts at ACS prompted a reduction in force, and that Plaintiff was one of many ACS employees whose provisional titles were eliminated and who were reassigned under their permanent titles. The question of whom those cuts affected was governed by the New York civil service laws and applicable collective bargaining agreements. Pl. Opp. 6. Because the record contains significant evidence supporting this explanation, Def. Ex. C; Pl. Ex. 53–55, Defendants have carried their burden at the second stage of the *McDonnell Douglas* analysis. *See Rosinski v. Am. Axle & Mfg., Inc.*, 402 F. App'x 535, 536–37 (2d Cir. 2010) (employer can satisfy burden by citing reduction in force); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (same).

Therefore, to proceed past summary judgment, Plaintiff must "point to evidence that reasonably supports a finding of prohibited discrimination." *Nolley*, 857 F. Supp. 2d at 455. It is possible, of course, for a reduction in force to be carried out in a way that discriminates against protected class members by affecting them disproportionately. *See Burger v. N.Y. Inst. of Tech.*, 94 F.3d 830, 834–35 (2d Cir. 1996). But Plaintiff does not dispute Defendant's explanation, instead confining his charges of "pretext" to ACS's (already insufficient) explanation for failing to promote him. Pl. Opp. 13–15. Accordingly, summary judgment is granted on Plaintiff's reassignment and demotion claims.

### 3.    Other Employment Actions

---

[13] Defendants articulate these reasons in the context of arguing that Plaintiff has not made a *prima facie* case. *See* Def. Br. 6; Def. Reply 10 n.6. But that amounts to an argument that Plaintiff does not make a *prima facie* case because the legitimate reasons for his reassignments preclude an inference of discrimination. Those legitimate reasons are properly considered during the second stage of the *McDonnell Douglas* standard.

Plaintiff also cites an assortment of allegedly discriminatory actions by his managers, Sealey and Cortez. These claims are governed by the same test as his reassignment and demotion claims: as (1) a member of a protected class who (2) was qualified for his job, he must show that he (3) suffered an adverse employment action that (4) occurred under circumstances giving rise to an inference of discrimination. *See Williams*, 368 F.3d at 126 (applying this formulation of the *McDonnell Douglas* standard to several allegedly discriminatory employment actions). Defendants contest the third and fourth elements of this test.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya*, 202 F.3d at 640. To qualify, such a change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Crady*, 993 F.3d at 136). Examples include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities," *id.*, but "there are no bright-line rules" and "courts must make this determination on a case-by-case basis," *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 351 (S.D.N.Y. 2006) (Karas, J.) (quoting *Pimentel v. City of New York*, No. 00 Civ. 326 (SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002)) (internal quotation mark omitted).

Plaintiff first claims that in March 2009, while he was still at OCM, where Cortez was also his manager, Cortez and Hay-Stevens downgraded his performance evaluation from "Very Good" to "Good" over the objection of Plaintiff's immediate supervisor, Vincent Sanchez. Pl. 56.1 ¶ 3(dd), at 10. Plaintiff has presented evidence that performance evaluations were important in determining who would be promoted, so the Court assumes that this downgrade constitutes an adverse employment action. *See Klein v. New York Univ.*, 786 F. Supp. 2d 830,

36

846 (S.D.N.Y. 2011) (Kaplan, J.) ("A negative performance evaluation must impact the terms and conditions of employment to be considered an adverse employment action."). However, Plaintiff does not explain how a factfinder should infer age or national origin discrimination from this downgrade.

Plaintiff next argues that while he was in JD/PINS, his supervisors gave him more work than they gave his colleagues; the Court will assume *arguendo* that this qualifies as an adverse employment action. As evidence, Plaintiff provides numerous monthly reports listing the number of PINS petitions that each employee was assigned. He claims that he was assigned disproportionate work until May 2011, "when only older employees of Nigerian national origin were in the unit." Pl. 56.1 ¶ 3(rr), at 15. Even if true, that is irrelevant: the exhibits from earlier months show that Clara Opara, another JD/PINS employee who Plaintiff asserts is Nigerian, was given fewer petitions than Plaintiff, so national origin cannot have been the reason for his workload. Pl. Ex. 60, 63. Moreover, while Plaintiff especially objects to the relatively light workload of Weiss, a younger white woman, he does not show that he and Weiss were similarly situated "in all material respects," as he must in order to raise an inference of discrimination based on differential treatment of a colleague outside his protected class. *See Shumway*, 118 F.3d at 64. In fact, there is evidence that Weiss performed "other functions" beyond her work in JD/PINS. Sealey Dep., Pl. Ex. 2, at 49. Furthermore, even if Plaintiff has made a *prima facie* case, Defendants have proffered a legitimate business reason for his heavy workload: he was slower than his colleagues at completing his assignments, creating a backlog on a month-to-month basis.[14] Def. Reply 5. There is significant evidence in the record supporting this

---

[14] Again, while Defendants make this argument in service of defeating Plaintiff's *prima facie* case, it is more appropriately considered at the second stage of the *McDonnell Douglas* analysis.

37

explanation. Pl. Ex. 66; Sealey Decl. ¶¶ 3–7. With Defendants' burden thus sustained, Plaintiff

has not provided sufficient contrary evidence to support an ultimate finding of discrimination.

Third, Plaintiff points out that his employers denied his request for a hardship transfer

while at JD/PINS, grounding his discrimination claim on the fact that Weiss received a transfer.

Again, the Court will assume *arguendo* that the denial of a transfer was an adverse employment

action. However, Plaintiff points to no evidence from which a factfinder might judge whether he

and Weiss were similarly situated with respect to their transfer requests. To the contrary, while

Plaintiff states only that Weiss's transfer was granted "for medical reasons," Pl. 56.1 ¶ 3(oo), at

14, there is other evidence in the record that she underwent surgery, Sealey Dep., Pl. Ex. 2, at

156. Plaintiff's request, on the other hand, dealt with stress purportedly inflicted by his work

environment. Given this distinction, a reasonable factfinder could not conclude that Plaintiff and

Weiss were similarly situated when it came to their transfer requests.

Fourth, Plaintiff argues that he was "denied training opportunities," Pl. 56.1 ¶ 3(tt), at 15,

although the only evidence in the record of such an episode involves Cortez and Sealey's refusal

to let Plaintiff miss work to attend autism training. The denial of training opportunities is an

adverse employment action only when an employee can show "material harm . . . such as a

failure to promote or a loss of career advancement opportunities." *Hill*, 467 F. Supp. 2d at 352.

Plaintiff has not alleged, much less shown, that he suffered any harm from Defendants'

insistence that he miss training.

Fifth, Plaintiff argues that Cortez failed to evaluate his performance while he was at

JD/PINS. Even if her failure to do so hurt Plaintiff's chances for promotion and thus qualifies as

an adverse employment action, Plaintiff again has not explained how a factfinder should infer

38

age or national origin discrimination from Cortez's actions.  There is no evidence, for instance, that Cortez evaluated other similarly situated employees outside Plaintiff's protected class.

Sixth, Plaintiff appears to argue that the memorandum from Cortez alleging insubordination in connection with the incident on March 26, 2010 was discriminatory.  A series of cases affirms that such disciplinary or "counseling" memoranda, unaccompanied by any material change in working conditions, do not constitute adverse employment actions.  *See, e.g.*, *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011); *Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Cody v. Cnty. of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009); *Williams v. N.Y. City Housing Auth.*, 335 F. App'x 108, 110 (2d Cir. 2009).  Plaintiff has not suggested or shown that he was disadvantaged in any way by Cortez's memorandum, and even if he was, he has not explained how the memorandum evidences unlawful discrimination.

Plaintiff's final claim centers on Cortez's attempt to dock his pay for missing work to attend depositions in this case; Plaintiff's pay was reinstated after he filed a grievance with ACS's labor relations office.  Plaintiff has again provided no evidence that Cortez's decision was motivated by discriminatory animus against older or Nigerian employees, and to the extent that Cortez's actions might be perceived as retaliatory, Plaintiff's retaliation claims are not currently before the Court.

E.  State Law Claims Against the Individual Defendants

The only age or national origin discrimination claim to survive summary judgment centers on Plaintiff's failure to be selected for the FSS Conference Facilitator position in Phase II

of the IOC initiative.  As discussed above, the Individual Defendants cannot be liable for that action under Title VII or the ADEA.

However, the state statutes that Plaintiff invokes provide for individual liability in some circumstances.  Under NYSHRL section 296(1), an individual may be liable for discrimination if she was an "employer," but only "individuals with ownership interest or supervisors, who themselves, have the authority to hire and fire employees" are considered employers.  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365–66 (S.D.N.Y. 2012) (Oetken, J.) (quoting *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 199 (E.D.N.Y. 2007)) (internal quotation mark omitted).  Under NYSHRL section 296(6), the statute's aiding-and-abetting provision, an employee may be liable only if he or she "actually participate[d] in the conduct giving rise to the discrimination."  *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)) (internal quotation mark omitted).  The latter standard also governs individual liability under the NYCHRL.  *See id.* at 157; *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012) (McMahon, J.).

There is no evidence in the record that any of the Individual Defendants had the hiring-and-firing authority or personal ownership stake necessary to meet the definition of "employer" within the meaning of the NYSHRL.  Nor has Plaintiff shown that they participated directly in ACS's failure to hire him for the FSS Conference Facilitator position.  As described above, Mattingly was not personally involved in the hiring decisions made during either phase of the IOC initiative.  The other Individual Defendants were Plaintiff's supervisors, and there is nothing to suggest that they were responsible for personnel decisions.  Accordingly, summary judgment is granted on Plaintiff's state-law age and national origin discrimination claims against the Individual Defendants.

## V. CONCLUSION

For the foregoing reasons, summary judgment is GRANTED on Plaintiff's section 1981 and 1983 claims against the City and Mattingly, and on all age and national origin discrimination claims against the Individual Defendants. Summary judgment is also GRANTED on all age and national origin discrimination claims against the City, except insofar as they relate to ACS's failure to select Plaintiff for the FSS Conference Facilitator position in Phase II of the IOC initiative. With respect to that claim, summary judgment is DENIED on Plaintiff's Title VII and state-law national origin discrimination claims against the City. As discussed above, this opinion does not address Plaintiff's retaliation or disability discrimination claims.

Additionally, pursuant to Rule 5 of this Court's Individual Practices in Civil Cases, it is hereby ORDERED that the parties shall submit their Joint Pretrial Report and any other required materials by October 2, 2013. Counsel for all parties are instructed to appear for a scheduling conference on September 27, 2013, at 11:45 AM, in Courtroom 906 of the United States District Court for the Southern District of New York, 40 Foley Square, New York, New York. The parties must participate in at least one hour of good-faith settlement discussions prior to the conference.

SO ORDERED.

Dated: September 16, 2013
New York, New York

ALISON J. NATHAN
United States District Judge

41